Scott, Chief Judge.
If the antenuptial agreement in this case was intended by, the parties to operate as an equitable jointure, and as such to bar all claims of the wife to dower in the real estate of the husband; if the parties were of mature age, and capable of judging in respect to their interests ; if the agreement was fairly entered into in good faith, and without any fraud or imposition; if it was reasonable In its terms, and was in good faith acted upon and carried into effect by Robert Mintier during his life, no good reason is perceived why full effect should not be given to it, according to the intention of the parties.
The plaintiff below does not, in her pleadings, complain of any fraud, imposition, or false representations, by which she was induced to enter into the antenuptial contract; she alleges no lack of judgment’ on her part, nor does she complain that the terms of the contract were unreasonable. And when we consider that Robert Mintier was, at the date of the marriage, some seventy-four years old; that, from his advanced age, the coverture must have been expected to be of short duration; that she brought no property to her husband, but was allowed to retain all her property (amounting to $1,000 in value), free from her husband’s control; that she was to be paid $1,000 in hand'before the marriage, and that she was to enjoy as her own, if she survived her husband, all that they, or either of them, might acquire or save during the coverture, together with all such household goods and furniture as Robert might own at his death, we can not say that this contract was clearly unreasonable, or even illiberal, in its provisions for her benefit.
Nor, as we have said, does the plaintiff below rest her claim to dower on any such ground; but she does claim, *313 first, that by the terms of the antenuptial contract she only released her right to dower in the real estate of which said Robert Mintier might die seized; that he did not die seized of the premises in which dower is demanded, but conveyed the same to the defendants below during, her coverture with him by deeds to which she was not a party.
And this brings us to the consideration of what we conceive to be the main question in this case, to wit, the true import and proper construction of the antenuptial contact set up in the answer of defendants below.
It is difficult to resist the conviction that the parties intended by this contract to specify fully what the prospective wife of Robert Mintier should receive and accept in lieu of the right of dower in his real estate, and distributive share of his personal property to which she would by the contemplated marriage be entitled, in the absence of any agreement to the contrary. The basis of the agreement seems to have been substantially this, that, in consideration of the provisions made in her favor by the contract, she should have no claim on his property already acquired, whether real or personal, but that he should be at full liberty to dispose of the same as he might think proper during his life, or by last will and testament, and that what they might acquire subsequently to the marriage by industry, or save by economy, should be hers if she survived him. The agreement, on its face, is shown to have been entered into for the express purpose of arranging or settling all the rights of the parties as to property. It was intended as a full “agreement and arrangement” on that subject.
It can scarcely be doubted, from the fact that the plaintiff below, in the antenuptial contract, releases expressly, “to the heirs and assigns of said Robert Mintier, all right or claim he would acquire by said marriage to dower ” in his real estate; that the conveyance and alienation of such estate by Robert during his lifetime was in the contemplation of the parties, and that it was intended that such conveyance might be made free from any right or claim to dower therein on the part of said Ann. Yet, strangely *314 enough, we find the release of dower to his assigns is, in terms, limited-to “ the real estate of which said Robert may die seized.” Could the technical language of this limitation have been purposely inserted in the contract, with an understanding by the parties of its import, or may it be regarded as mere legal phraseology and verbiage employed by the draftsman without due consideration, and ignorantly adopted by the unlearned parties to the contract ?
It must be conceded that effect should, if possible, be given to all the terms of the contract so far as may not be inconsistent with the clear intention of the parties; yet, in giving construction to a contract, technical language which, in its strict legal import, is inconsistent with the manifest intention of the parties, should doubtless be rejected, or so construed as to comport with that intention.
In the case before us, it is very clear that the parties intended to provide by the antenujrtial' contract that the lands of which Robert Mintier was seized at the time of his marriage, if he continued to be so seized of them till his death and should die intestate, should descend to his heirs, free from any claim to dower therein on the part of Ann, his prospective wife. She expressly “ releases to his heirs all right or claim she would acquire by her marriage to dower ” therein. She similarly releases all right or claim to dower to his assigns. Any restraint upon his -power of alienation and conveyance free from dower, during his life, would be a serious inconvenience and detriment to him. And it is scarcely conceivable that she should have asked, or that she should have consented to the imposition of such a restraint, unless for the purpose of securing some benefit or advantage to her. Net the contract manifestly, left him at liberty to devise, by last will and testament, the lands in which dower is now demanded to his children, in whose possession and occupancy they were at and for several years prior to the date of the antenuptial contract. And during his lifetime he could have left the lands in the occupancy and control of his sons, the defendants below, upon such terms &s he chose. Whether he should require them *315 to pay rent, and if so, at what rate, were matters in regard to which the contract in question left him an unlimited discretion. It is wholly silent on the subject. No conceivable prejudice or damage arises to the widow, from the fact that the lands were conveyed to his sons by Robert Mintier, by deeds executed during his life, and not by devise, to take effect at his death.
And it is equally clear that Robert Mintier, the husband and father, might have disposed of these lands substantially as he has done, by executory contracts, made in writing with his sons during his life, the specific execution and performance of which he might have left to be ordered by a court of equity after his death. And in such case it could hardly have been claimed that the plaintiff below had not released dower in the premises by the very terms of the antenuptial contract. And is she at all prejudiced by the fact that such contracts were fully executed by her husband befox*e his death? That they were not left to be carried into execution after his death by a court of equity ? Ox*, by the fact that the title did hot pass by descent or devise ? If these questions must be answered ixx the negative, is it reasonable to suppose that the pax'ties understood and intended that the x*elease of dower should depend upon the time when, or the mode in which, the title should pass froxn the husband to “his heix*s or assigns?” If she intended to release dower only in the lands of which he might die seized, then she did not ixxtend to release dower to his assigns who should become such by the ordinax*y and .usual mode of conveyance by deed. If this, the most common and frequent method of creating assigns, was intended to he excluded from the operation of the release for any conceivable reason, it would be but reasonable to suppose that such a restraint on the husband’s power of alienation would have been expressed in -direct terms, in an agreement which had for its sole object the arx*anging and settling the xúghts of property between the parties, and would not have been left to mere inference from technical language, which, under the guise of generality, imports a limitation not *316 readily understood and comprehended by unlearned persons —such as “ all right or claim she would acquire by said marriage to dower in the real estate of which said Robert may die seized.” We think it much more probable that these limiting words were inadvertently inserted by the scrivener because the children and “ heirs ” of Robert were exclusively in his’ mind at the moment, or upon the supposition that as Ann had agreed to release all claim of dower “ to his assigns” she would execute this agreement by joining with him in any conveyance which he might desire to make during his life, and therefore it was only necessary to provide in regard to the- lands of which he might die seized. Unfortunately, however, relying upon this release as it would seem, Robert Mintier subsequently executed alone the conveyances to his sons for the farms in question.
They were but the execution of previous arrangements between the parties, and it does not appear from the evidence that the plaintiff below was asked and refused to unite with her husband in their execution. Had such refusal occurred, and the attention of Robert had been called to the special terms of the contract, it can scarcely be doubted that his contemplated arrangements for the division of his property among his ten children would have been effected in a mode which would have left no ground for the present claim to dower.
But in- whatever way the limitation of the release under consideration may have found its way into the antenuptial contract, when we consider the circumstances under which the agreement was made, the purpose and intention of the parties in entering into it; when we look at the language which precedes this limitation, and also at that which follows it, in which she releases all right or claim, “ to any distributive share out of any notes, bonds, mortgages, and moneys on interest now owned by said Robert, and agrees never to set up any claim to dower above specified, or to any distributive share of said personal property; ” when we consider that the release was not to his heirs only, but to bis assigns also, and that the contract, even as written, left *317 Robert at full liberty to dispose of all his lands at his pleasure, free from any claim to dower, provided he retained the legal title thereto till his death, and that she could have no conceivable interest in his retention of the mere legal title, we are clearly convinced that the limitation of the release to “ the real estate of which said Robert may die seized,’ must have been inserted in the contract through inadvertence or mistake on the part of the scrivener, .and does not accord with the actual intention of the parties. We think it evident that the intention of the parties was to extinguish by i'elease all the statutory rights of property which, in the absence of an antenuptial contract, Ann would acquire by the marriage, and to substitute for them the specific provisions made for her benefit by the agreement.
And, indeed, her reply to the answer of the defendants below, setting up this antenuptial contract, seems to proceed not so much on the idea that the contract fairly construed would not bar her claim to dower, as upon the allegation that it was fraudulently violated by her husband during his lifetime. • In regard to this allegation we may say that if Robert had the right, under the contract, to convey his lands to his sons free from any claim to dower, we find nothing either in the findings of fact by the district court in the ease of'John Mintier, or in the parol evi. denee in the other cases, which would justify us in finding that Robert did not in good faith carry out the contract during his life. It is true that parol evidence was offered on the trial in the court below, tending to prove that at the time of making the antenuptial contract, Robert represented that his income was derived mostly from the rents of his lands, and amounted to about $1,000 per year after payment of taxes, and that if Ann would be as economical as she said she was, they could save out of this income five or six hundred dollars per year, which she would have at his death as savings, instead of the dower which she was releasing. These representations' are not shown to have been in any respect untrue.
*318 It also appears from the testimony of the executor of Robert, that his personal estate at his death amounted to nearly $4,700, of which $2,500 was moneys paid to him on sale of his lands to his sons, the defendants below.
"Whether these representations as to his income, which were no doubt true of the past, were intended to be, and were in fact, relied upon as a warranty in regard to the future, may perhaps well admit of grave doubt. And if such were the fact, still as Robert lived less than two years after the marriage, and received $2,500 from his sons on sale of his lands to them, which came to the hands of his executor, and to which Ann has not, by the terms of the contract, released her right to her distributive share, it is at least questionable whether these representations have not been fully made good to her. Hut, be this as it may, these are questions to be' settled between her and the executor of her husband. No rights accruing to her under the contract during her husband’s life were withheld from her. And she has a full remedy against his executor, if any of her rights under the contract, are denied to her after his death. It is to be observed that she does not seek to rescind the antenuptial contract, and place the estate of her husband in statu quo, by returning the $1,000 received by her in consideration of her release of dower. Hut, retaining all the benefits secured to her by the agreement, she claims dower in all the lands of her husband, as though no contract had been made on the subject, or as though her right to.dower was not released by its terms fairly construed. As she does not ask for a rescission of the contract either on the ground of fraud in its inception or its execution, nor offer to return what she has received under it, we think her rights must be deter-mined by it, and if her rights under it have been denied or refused to her by the executor, her remedy is by action against him, and not against the grantees of her husband, who have ’ paid full value for the lands in which she seeks dower.
In accordance with these views, her petition in the case of John Mintier, which was reserved in the District Court *319 of Belmont county, will be dismissed, - and in the other cases which come before us, upon error to the judgment of the District Court of Harrison county, the judgment of that court will be reversed, aiid the causes be severally remanded for trial and judgment -in accordance with this opinion.